### JOHNS–PRATT CO. v. SACHS CO. et al.

(Circuit Court of Appeals, Second Circuit. December 14, 1909.)

#### No. 73.

1. PATENTS (§ 287*) — INFRINGEMENT — CORPORATIONS — STOCKHOLDERS — PERSONAL LIABILITY.
    Stockholders of a corporation alleged to have infringed a patent are not liable in the absence of proof of individual acts of infringement.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 459; Dec. Dig. '§ 287.*]

2. PATENTS (§ 129*)—INFRINGEMENT—PRIOR ART.
    In a suit for infringement brought by the assignee of the patentee against the patentee and a company he has created and controlled to exploit the same appliance, an inquiry into the prior art to ascertain the validity of the patent assigned will not be undertaken; the patentee and his corporation being estopped to urge the invalidity of the patent as against his assignee.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. § 129.*]

3. PATENTS (§ 328*)—ELECTRIC SAFETY FUSE—INFRINGEMENT.
    The Sachs patent, No. 660,341, for an electric safety fuse, construed, and *held* infringed.

Appeal from the Circuit Court of the United States for the District of Connecticut.

Bill by the Johns-Pratt Company against the Sachs Company and others to restrain the alleged infringement of letters patent, No. 660,-341, issued October 23, 1900, to Joseph Sachs for improvement in electric safety fuse. From a decree dismissing the bill (168 Fed. 311),

complainant appeals. Affirmed as to defendant Hart and Parker, and reversed as to defendant Sachs and the Sachs Company.

Edmund Wetmore and Oscar W. Jeffery, for appellant.
John P. Bartlett and Henry B. Brownell, for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. The defendants Hart and Parker are stockholders and directors in the defendant company, but our attention has been called to no act of theirs which would warrant a finding that either of them has individually infringed the patent. The dismissal of the bill as to them need not be further considered. The defendant Joseph Sachs is the patentee. He assigned the patent to complainant and subsequently organized the Sachs Company, of which he is a large stockholder and the moving spirit. We understand it is not disputed that Sachs and the company are therefore estopped from questioning the validity of the patent, a circumstance which simplifies the issues before us.

The keynote of Sachs' invention is repeated over and over again in the specifications and emphasized in every claim except the sixth (into which, however, it may fairly be read by construction). There seems to us to be no doubt as to what it was that Sachs thought he had discovered, what he said he had discovered, what he claimed to be his invention, and what the Patent Office allowed him. There is no variance between the extended description of his invention in the specifications and the condensed epitome of it in the claims. If the prior state of the art were such that his assertions of novelty were fallacious there would be no real invention disclosed, his claims would be unwarranted and his patent void. But in a suit for infringment, brought by the person to whom the patentee sold the patent at its face value, against him and the company he has created and controls, an inquiry into the prior art for such purpose is not to be undertaken. This principle is too well settled to require citations. As to the rest of the world the patent may be void, but the assignor is estopped from urging that defense against his assignee. Sachs has testified at great length as to the development of his ideas and what he intended to express in his application for the patent, but such testimony is not persuasive when given by a patentee in derogation of his patent against the person to whom he has assigned it.

The specification states that:

"Safety-fuses have usually been heretofore inclosed in a tubular case and surrounded with a filling of non-conducting material. These fuses have consisted of a wire which when fused by an excess current was maintained in place in a melted state by the surrounding filling material and the fused metal still served to carry the current for a period" (a defect known as hanging) "until the same gradually became dispersed in the interstices of the filling and the circuit broken. The fuse-wires used in such fuses have been of lead or lead-tin alloy, and since this metal has a low conductivity a very large section of metal was used for the fuse-wires to carry the current, and this large section when fused was difficult to disperse in the filling material. This hanging of the fuse-wire in a melted state made such fuses inaccurate as to their carrying capacity. I have discovered that the nonarching qualities or action of a fuse depends upon the disposition, character and amount

of the metal and that for this purpose a fuse-strip having a relatively small quantity of metal will give the best results. I have also discovered that the best results are obtained from the use of a metal which when melted or fused rapidly oxidizes even if the melting-point of the metal is not comparatively low.

"My invention relates to a safety-fuse of a metal made thin and fine and disposed through an appreciable area of the tube section, and the same preferably consists of a flat thin strip held between terminals having a better conductivity than the fuse itself, said strip being preferably of a rapidly-oxidizing metal." [Reference to the drawings shows the strip to have an extended area longitudinally between the "terminals of better conductivity." an arrangement adapted to correct the defect of arcing, when the metallic vapors resulting from the fusion tend to afford a conductive path for the current.] "A fuse of this character placed in a tubular case and surrounded with a non-conducting filling and fused by an excess current will not only rapidly oxidize, but become quickly distributed in the interstices of the filling material. Where the surrounding material combines with the fused wire" [a verbal error, the strip of the patent is intended] "the combination is more readily accomplished because of the greater surface of material exposed in the fuse-wire" [a similar error] "and in contact with the surrounding material. I have found that zinc or an alloy of zinc is best suited to my purpose and that the thinner and finer the metal and the greater the spread thereof the better. Where the non-conducting filling material is of a character to combine with the fuse-strip when melted, the thin strip of increased melting-point is an advantage. The thin fine strip of metal is distributed through a larger section of the inclosed filling and thus on disruption more readily dispersed through the interstices of the filling than if the strip were of compact sectional area."

Two only of the drawings need be reproduced here.

The tubular inclosing case, a, is preferably made with metal end, a′. connected thereto, and the case is provided with a non-conducting filling, b. The fusible strip is c, having terminals, d, of better conductivity than the fusible strip; e e are the external terminals or connections. The specification proceeds:

"The strip, c, is of very thin flat metal, occupying considerable area across the case, and in the same there is a relatively small quantity of metal, and the metal is preferably one that rapidly oxidizes. This I prefer to be a strip of zinc or an alloy of zinc, the terminals. d, connected therewith, being of

greater size and better conductivity and of course being far distant from one another within the case that when the strip, c, is fused and disperses in the interstices of the filling said terminals are too far apart for the passage of any current or spark or for the existence of any arcing condition. If this thin strip is melted by an excess current instead of remaining in place in the filling, as would a wire of compact section, it is dispersed quickly in the interstices of the filling upon either side of the thin strip, so that the circuit is broken immediately. I am enabled to accomplish the same result by using the form of strip shown in Fig. 3 where the terminals, d', are integral and of the same material, but wider than the central strip, c', and in which of course the action of the excess current would be to destroy the narrow central strip, c', before melting the ends, d'. * * * As hereinbefore stated I do not only prefer to make fuse-strip of thin metal of an extended area, but to make the same of such metal, as zinc or an alloy of zinc, that rapidly oxidizes when fused, and I may use in connection with these fuse-strips a filling material of a character to combine with the fuse-strip when melted; but I do not limit myself to this form of filling."

The first part of this last sentence is awkwardly expressed. It may mean merely that the inventor prefers the form of strip shown in Fig. 1, with extended area throughout its entire length, to the form shown in Fig. 3. It may mean merely that he prefers to use rapidly oxidizing metal. It certainly cannot mean that a "fuse-strip of thin metal of an extended area" is merely a preferred form, because the specifications and claims clearly show that such a form—in proper combination with other elements—is the gist of the alleged invention.

The claims are:

"(1) A safety-fuse comprising a case and a filling of non-conducting material and fuse-strip therein of thin flat metal of extended area, substantially as and for the purposes set forth.

"(2) The combination in a safety-fuse with a tubular case and a non-conducting filling material, of end terminals within the case of relatively ample conductivity, and a fuse-strip of thin flat metal of extended area connected to and between the said terminals, substantially as and for the purposes set forth.

"(3) The combination in a safety-fuse with a tubular case and a non-conducting filling material, of end terminals within the case of relatively large area and ample conductivity, and a fuse-strip of thin flat metal of extended area connected to and extending between the said terminals, metal ends to the case and through which the terminals pass and external terminals or connections outside of the said ends and connected to the inner terminals, substantially as and for the purposes.

"(4) The combination in a safety-fuse with a tubular case and a filling of non-conducting material, of a fuse and terminals within and extending through the case, the fuse being of thin flat metal of extended area with the ends thereof wider than the central portion, substantially as and for the purposes set forth.

"(5) A safety-fuse comprising a case and a filling of a non-conducting material and a single flat fuse-strip therein, of thin metal of extended area and maximum contact with the filling material and terminals at the ends of the fuse-strip and case, substantially as set forth.

"(6) The combination in a safety-fuse with a tubular case and ends for closing the same and a non-conducting filling within the same, of a thin fine fuse in a flat plane consisting of a rapidly-oxidizing metal and terminals of relatively better conductivity connected to the respective ends of the flat fuse at the ends of the case, substantially as and for the purposes set forth."

From the above quotations it will be seen that certain features of the patentee's fuse are preferential only. A "rapidly-oxidizing metal" is preferred. The surrounding non-conducting material may be one

which "combines with the fused wire," but the inventor does not limit himself to that form of filling. He also prefers "terminals having a better conductivity than the fuse itself." Eliminating these preferentials, it is manifest that the novelty which the patentee sought to secure consisted in making the fuse-strip of thin flat metal of extended area instead of a wire or other strip having a compact sectional area: the object being to increase the surface of the metal with which the filling is in contact, so as to insure its immediate dispersion, when fused, in the filling material. The difference between such a strip thus brought in contact over an extended surface and wires and strips of compact cross-sections which were found in the earlier art was emphasized in correspondence with the examiner, who allowed the claims after requiring the applicant to withdraw an alternative form in which the fuse-strip consisted of a series of slender wire-like strands, the members of which were parallel with one another forming a flat series. The examiner evidently considered that form not patentably different from the wires of the prior art, and pointed out that the filling could not with such a structure be brought in contact with the metal over an extended area.

We do not find it necessary in this suit to search the prior art to see if it discloses the existence of a thin flat metal fuse-strip of extended area in contact over its surface with non-conducting filling, because, if such a structure were shown to be old, there would be no patentable novelty in the device described in the specifications and passed by the Patent Office, and the patent would be void for lack of invention. The defendant Sachs and the company which he organized and controls cannot be heard to sustain such a defense against the assignee to whom he sold his patent.

It is apparent upon mere inspection that the fuse-strips of defendant are flat thin strips of extended area, and not wires or strips of compact sectional area, and they contact over their entire surface with the filling material. Various tests were made by both sides and the results described by the experimenters at considerable length. Without discussing this testimony, we may say that we are satisfied that flat strips of the size made by defendant, with a thickness of .018 on an inch for the larger ones and .009 of an inch for the smaller ones and without perforations, do, under overload, achieve the results contemplated in the patent. But it seems to be the experience of both sides that still better results are obtained by making a perforation at the center of the strip and the fuses marketed by both are thus perforated. This reduces the cross-section of the metal, and insures quicker disruption at the place where such reduction is found. This is called "calibration"—the caliber of the strip is made smaller. That, however, is an old and well-known expedient for improving the disrupting action of fuse-strips whether thick or thin. It is shown in the Perkins patent where part of the metal of the thick fuse-strip is removed by cutting a notch in one side of the strip at its center. Whether a single notch is cut out on one side or two notches exactly opposite each other, or a piece is cut out of the middle is immaterial, the caliber is reduced by equivalent means. We do not think it important that

the device of the patent has been rendered more efficient by the use of a supernumerary device old in the art, so long as the fuse-strip to which such supernumerary device is applied is the fuse-strip described and claimed in the patent.

The decree is affirmed as to Hart and Barker, with costs, and reversed as to Sachs and the company, with costs, and cause remanded, with instructions to enter a decree in the usual form against them with costs.