JOHNS–PRATT CO. v. E. H. FREEMAN ELECTRIC CO.

(District Court, D. New Jersey. December 13, 1912.)

1. PATENTS (§ 26*)—INVENTION—COMBINATION OF OLD ELEMENTS.

Each and every separate element of a combination may be old, and yet the combination as a whole may show patentable novelty and invention if the several elements so coact as to produce a result which is either new in itself, or by means of such coaction is produced in a novel or improved way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*

Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

2. PATENTS (§ 66*)—ANTICIPATION—PRIOR ART.

A patent is not in the prior art with respect to another which at the time of its issuance was pending on application in the Patent Office.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SAFETY-FUSE.

The Sachs patent, No. 660,341, for a safety-fuse, consisting of a combination of elements, the most important of which is a thin, flat safety strip of rapidly oxidizing metal, of extended area, and maximum contact with the nonconducting filling in the case, was not anticipated, and discloses patentable novelty and invention; also *held* infringed.

Suit in equity by the Johns-Pratt Company against the E. H. Freeman Electric Company. On final hearing. Decree for complainant.

Wetmore & Jenner, of New York City (Edmund Wetmore, of New York City, of counsel), for complainant.

D. P. Wolhaupter, of Washington, D. C., for defendant.

CROSS, District Judge. The complainant is the undisputed owner by assignment from one Joseph Sachs of letters patent No. 660,341, bearing date October 23, 1900, for a safety-fuse. This patent the complainant by its bill of complaint herein alleges the defendant has infringed. This allegation the defendant denies, and it also denies the validity of the complainant's patent. Sachs, the patentee, in his application, speaking of the prior art and generally of the nature and character of his invention, says:

' "Safety-fuses have usually been heretofore inclosed in a tubular case, and surrounded with a filling of nonconducting material. These fuses have consisted of a wire which, when fused by an excess current, was maintained in place in a melted state by the surrounding filling material, and the fused metal still served to carry the current for a period until the same gradually became dispersed in the interstices of the filling and the circuit broken. The fuse-wires used in such fuses have been of lead or lead-tin alloy, and, since this metal has a low conductivity, a very large section of metal was used for the fuse-wires to carry the current, and this large section when fused was difficult to disperse in the filling material. This hanging of the fuse-wire in a melted state made such fuses inaccurate as to their carrying capacity. I have discovered that the nonarcing qualities or action of a fuse depends upon the disposition, character, and amount of the metal, and that for this purpose a fuse-strip having a relatively small quantity of metal will give the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

best results. I have also discovered that the best results are obtained from the use of a metal which when melted or fused rapidly oxidizes even if the melting point of the metal is not comparatively low.

"My invention relates to a safety-fuse of metal made thin and fine and disposed through an appreciable area of the tube-section, and the same preferably .consists of a flat thin strip held between terminals having a better conductivity than the fuse itself, said strip being preferably of a rapidly oxidizing metal. A fuse of this character placed in a tubular case and surrounded with a nonconducting filling and fused by an excess current will not only rapidly oxidize, but become quickly dispersed in the interstices of the filling material. Where the surrounding material combines with the fused wire, the combination is more readily accomplished because of the greater surface of material exposed in the fuse-wire and in contact with the surrounding material. I have found that zinc or an alloy of zinc is best suited to my purpose, and that the thinner and finer the metal and the greater the spread thereof, the better. When the nonconducting filling material is of a character to combine with the fuse-strip when melted, the thin strip of increased melting point is an advantage. The thin fine strip of metal is distributed through a larger section of the inclosed filling, and thus on disruption more readily dispersed through the interstices of the filling than if the strip were of compact sectional area."

Later, and speaking more particularly of the fuse-strip, he adds:

"The strip c is of a very thin flat metal, occupying considerable area across the case, and in the same there is a relatively small quantity of metal, and the metal is preferably one that rapidly oxidizes. This I prefer to be a strip of zinc or an alloy of zinc, the terminals d, connected therewith, being of greater size and better conductivity, and, of course, being so far distant from one another within the case that when the strip c is fused and disperses in the interstices of the filling said terminals are too far apart for the passage of any current or spark or for the existence of any arcing condition. If this thin strip is melted by an excess current instead of remaining in place in the filling, as would a wire of compact section, it is dispersed quickly in the interstices of the filling upon either side of the thin strip, so that the circuit is broken immediately."

The patent has six claims, all of which it is alleged have been infringed by the defendant. It will be unnecessary, however, to set forth more than the second of them, in order to give a sufficiently clear conception of them all. That claim is as follows:

"2. The combination in a safety-fuse with a tubular case and a nonconducting filling material, of end terminals within the case of relatively ample conductivity, and a fuse-strip of thin flat metal of extended area connected to and between the said terminals, substantially as and for the purposes set forth."

The patent in suit was indirectly considered by the Circuit Court of Appeals for the Second Circuit, in Johns-Pratt Co. v. Sachs Co. et al., 175 Fed. 70, 99 C. C. A. 92, in which Sachs was a defendant, as was also a corporation organized by him, and in which he was found to have been a large stockholder and a moving spirit. The defendants therein were alleged to have infringed the Sachs patent, an allegation which they denied; but inasmuch as Sachs, the patentee, had assigned his patent for a valuable consideration to the complainant, he was held to be estopped from denying its validity, thereby rendering it unnecessary to adjudicate that point. Consequently whatever was said by the court in relation thereto was entirely obiter. Nevertheless its high standing and reputation necessarily give great weight

to all of its utterances. It is not surprising, therefore, that the defendant's counsel at the argument urged upon the attention of this court the following expression by Judge Lacombe, who delivered the opinion of the court in the case referred to, and who, after quoting from the specification of the patent and setting forth its various claims, added:

"Eliminating these preferentials, it is manifest that the novelty which the patentee sought to secure consisted in making the fuse-strip of thin flat metal of extended area instead of a wire or other strip having a compact sectional area; the object being to increase the surface of the metal with which the filling is in contact, so as to insure its immediate dispersion, when fused, in the filling material. The difference between such a strip thus brought in contact over an extended surface and wires, and strips of compact cross-sections which were found in the earlier art, was emphasized in correspondence with the examiner, who allowed the claims after requiring the applicant to withdraw an alternative form in which the fuse-strip consisted of a series of slender wire-like strands, the members of which were parallel with one another forming a flat series. The examiner evidently considered that form not patentably different from the wires of the prior art, and pointed out that the filling could not with such a structure be brought in contact with the metal over an extended area.

"We do not find it necessary in this suit to search the prior art to see if it discloses the existence of a thin flat metal fuse-strip of extended area in contact over its surface with nonconducting filling, because, if such a structure were shown to be old, there would be no patentable novelty in the device described in the specifications and passed by the Patent Office, and the patent would be void for lack of invention."

[1] The defendant's counsel in the present suit, seizing and relying upon so much of the foregoing extract as relates to fuse-strips, and upon the additional fact that fuse-strips are repeatedly referred to in the prior art, strenuously argued at the hearing that the Sachs patent is invalid for want of novelty and invention. This argument, however, leaves out of sight the special characterization of the fuse-strip of the patent in suit, viz., that it is a strip of a thin, flat, rapidly oxidizing metal of extended superficial area, which is so peculiarly located and so peculiarly connected with the other elements in the combination that it is enabled thereby to coact with them in the production of a novel and useful result: It should be noted, moreover, and special emphasis laid upon the fact, that the patent is for a combination and that the claims are combination claims; hence, while it is not denied that the several elements in the combination are old, it does not follow therefrom that the patent is invalid. Each and every separate element of a combination may be old, and yet the combination as a whole show novelty and invention. The question in all such cases is whether the several elements so coact as to produce a result which is either new in itself or one which by means of such coaction is produced in a novel or improved way. Twenty-five or more patents and various publications of the prior art are set out in the defendant's answer, and claimed fully and conclusively to establish the invalidity of the patent in suit for lack of novelty and invention.

The patents just referred to were issued between May, 1880, and June, 1900, but the record does not show whether any of them, or, if any, which of them, were commercially successful. For all that appears, they may have been merely paper patents. It does, however,

clearly appear in the record that in May, 1895, at a meeting of the American Institute of Electrical Engineers, great dissatisfaction was expressed among the members at the state of the fuse art, and it was said, among other things, "that fuse-metals are under no circumstances to be considered in the light or nature of a protection." And, again, that the commercial fuses then on the market had been tested, and it was found "that none of them came anywhere near doing what they were advertised to do," and that there were "innumerable objections that could be stated to the use of fuse-metal for the protection of wires and preventing of overheating the same." The foregoing remarks were made, as already stated, at the May, 1895, meeting of the Institute. Again, at its October meeting of the same year, in speaking of the safety-fuse, acting by heat, it was said, notwithstanding its use was universal, "that it is still one of the most unreliable of the many devices employed on electric circuits," and of fuse-wires in general "that they are by no means relied upon, indeed the very term 'fuse-wire' is almost synonymous with unreliability." More remarks of the same derogatory character were made at those meetings, but it seems unnecessary to reproduce them. It is sufficient to say that the discussion of the safety-fuse and of fuse-metals by the members of the society on those occasions clearly shows that up to that time nothing reasonably safe or reliable had been produced in the safety-fuse art. Safety-fuses were unquestionably in common use, but they were unsatisfactory, and especially unsatisfactory to persons skilled in the art. Something far better was demanded. It is well to note at this point that between the date of the last-mentioned meeting of the Institute of Electrical Engineers and the date of the patent in suit but five of the numerous patents set forth in the defendant's answer were issued, and of them one was issued to Sachs, the patentee of the patent in suit, and another to one Downes, which, for a reason that will subsequently be referred to, cannot be considered as forming a part of the prior art. The consideration of those later patents is important with a view to ascertaining what advance, if any, they had made in the art, and to what extent, if at all, they had solved the defects which prior to that time had admittedly existed therein, and. been deemed of sufficient importance to engage the serious attention and thought of electrical engineers. The first of the five patents just referred to is No. 597,969, issued to one Ferguson in 1898. It covers an open link fuse, and is not designed to be used, or capable of being used, as an inclosed fuse. The fuse strip is arched, and by narrowing the fuse at the crown of the arch the patentee made certain its rupture at that point. Ferguson's idea and the scope and purpose of his patent are so entirely different from that disclosed by the patent in suit as to render any further or extended consideration of his patent unnecessary.

Next we have a patent to Hadaway, No. 620,309 (1899). While one or two of the drawings of this patent are not unlike those of the patent in suit, a study of the specification fails to show any substantial likeness to the underlying principle of that patent. Hadaway states that his object was "to secure the conversion of the fuse-wire or strip into

an insulating substance below the temperature at which the fuse will melt, and to thus avoid the formation and dispersion of heated particles, which may do injury to surrounding objects." Later he says:

"The primary feature of my invention is the use in an electric fuse of magnesium which oxidizes below the point of fusion, and the secondary features of the invention are the use of such magnesium as a coating for copper or other metal and the combination with the magnesium of a coating of manganese binoxid to effect the oxidation of the magnesium, at a perfectly definite temperature dependent upon the heat of the binoxid."

The fuse thus described is somewhat similar to one disclosed in a prior patent to Sachs, both of which, as testified to by complainant's expert, undertake to convert the conductor by chemical action into a nonconductor. Hadaway's first claim shows the nature and character of his invention and its complete unlikeness to the patent in suit. That claim reads as follows:

"1. In an electric fuse, a magnesium wire or strip employed to conduct and to break the current, and adapted to oxidize below the point of fusion, and thus forming an infusible conductor under such conditions, substantially as set forth."

The next of the five patents above referred to is No. 635,395, issued to Sachs in 1899. Whatever may be said for or against this patent, it is certainly true that it nowhere suggests the fuse of the patent in suit. The idea of a fuse-strip of thin, flat, rapidly oxidizing metal of extended area, or, as expressed in another place, of relatively large area, entirely surrounded by a pulverized material in combination as stated, is nowhere suggested by this earlier patent of Sachs. Moreover, this patent, although granted just prior to the patent in suit, was not cited or referred to by the examiner, and defendant's counsel did not specially rely upon it at the argument.

[2] The last of the patents referred to is No. 640,371, which was issued to one Downes in 1900. By this patent Downes suggests the employment of a plurality of wires of tin, copper, or lead alloy, so that by separating the metal composing the fuse into smaller divisions greater opportunity would be afforded when the metal composing the same is volatilized for the gases to expand and mingle in the filling surrounding the fuse-wires. This patent notwithstanding it was cited by the examiner as an anticipation of the patent in suit as a matter of fact is not found in the prior art. It was issued in January, 1900, which, although prior to the date of the issue of the patent in suit, was subsequent to the filing of the application therefor, and consequently Downes cannot properly be cited as an anticipation of it. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Diamond Drill Co. v. Kelly Bros. (C. C.) 120 Fed. 282; Union Typewriter Co. v. L. C. Smith & Bros. (C. C.) 173 Fed. 288; General Electric Co. v. Allis-Chalmers Co. (C. C.) 190 Fed. 165. At all events, so much of the patent in suit as was deemed by the examiner to have been anticipated by Downes was eliminated by Sachs upon objection by the examiner, and this was done without detracting from that which remained, and also without estopping the applicant from claiming the full benefit of what he was finally allowed. The Downes patent called, as already stated, for a

fuse consisting of a plurality of wires. Sachs in his original specification, in addition to what was finally allowed him, asked for a fuse composed of a "series of slender strips or wire-like strands," and it was this form, and this only, which in view of Downes was denied him and to which denial he yielded.

[3] This brief examination of such. of the alleged anticipatory patents as were issued between 1895 and 1900 does not show any particular advancement of the art, certainly not any advancement at all approximating that made by the patent in suit; nor does the record show that a single fuse was ever made under' any of those patents. Apparently the members of the Institute of Electrical Engineers could at any time down to the issue of the Sachs patent in suit have met and bemoaned the unprogressive and unsatisfactory condition of the fuse art with as much genuine concern as they did in 1895. Once, however, the patent in suit was issued, we find that a long-felt want had apparently been met, since undisputed testimony shows that the annual sales of fuses made under that patent have ranged between 200,000 and 400,000 since the date of its issue.

But if, as has just been determined, none of the patents issued after the meetings of the Electrical Engineers above referred to were held anticipated the patent in suit, it is manifest, if the defendant's position that it had been completely anticipated is well taken, that at the very time the Electrical Engineers were bemoaning the stagnant and unsatisfactory state of the fuse art there were, and had been for years, patents in existence which met their most exacting demands. One of these is a British patent, No. 19,076, issued in 1880 to one Mordey, and an American patent, No. 622,511, issued to him for the same invention in 1899. Before considering somewhat in detail the character and scope of this invention, it should be said of it that it comes nearer to anticipating the Sachs patent than any other, and that, if it does not anticipate it, no other of those cited does. But the Mordey patent as an anticipation must be judged by the knowledge of the art which existed at the time when the British patent was issued. Mordey in his specification describes a fuse consisting of a thin wire or strip of tin foil, or sheet of metal, but he nowhere speaks of the strip as having extended or superficial area, nor does he assert for the strip form any peculiar or special advantage. The drawings show nothing but a small copper wire fuse. And just here it may be remarked that the prior art shows numerous patents wherein the fuse is spoken of as a wire or strip. The word "strip" apparently being used as synonymous with wire, certainly no especial advantage was ever attached in the prior art to a fuse of the strip form. On the contrary, in the present case, the combination between the "extended area" of the fuse-strip of the patent in suit and the surrounding filling is set forth in the specification as follows:

"The thin fine strip of metal is distributed through a larger section of the inclosed filling, and thus, on disruption, more readily dispersed through the interstices of the filling than if the strip were of compact sectional area."

And again in claim 5 the fuse-strip is spoken of, not only as being imbedded in a filling of nonconducting material, but as consist-

ing of a single flat strip of thin metal of extended area and maximum contact with the filling material and terminals at the tends of the fuse-strip and case. The idea of giving to the fuse-strip extended superficial area so that it might have maximum contact with the filling material and terminals is novel to the patent in suit, and cannot be found elsewhere. But it may be said there is no invention in all this; that it relates merely to a matter of size or degree. But this is clearly not so. It is rather a matter of invention as pointed out by Judge Platt in Johns-Pratt Co. v. Sachs Co. et al. (C. C.) 168 Fed. 311, where, in sustaining this patent, he said:

"That such a novel strip is patentable has been decided in the Incandescent Lamp Case, 52 Fed. 309, 3 C. C. A. 83. There a rod was reduced to a filament, and it is held that such a change in dimension produced a new result and was therefore a difference in kind rather than in degree."

Furthermore, the Mordey fuse wire or strip is not attached to inner terminals of relatively ample, and better conductivity, as demanded for the Sachs fuse. Indeed, the ends of the Mordey fuse are not within the tube at all, and consequently the fuse is not, and cannot be, completely surrounded by the filling, and this notwithstanding it is provided that the tube may be wholly filled with a finely divided nonconducting material. Again, while Mordey at first says that the tube may be wholly filled by a nonconducting filling surrounding the conductor, which we have just seen it does not, and cannot do because the ends of the conductor are not within the tube, he later admits that that is only an inferior method of construction, and that, after all, it is better to surround the fuse in whole or in part by an air-space which will both afford means for observation and also serve as a heat nonconducting medium. These ideas are expressed in the specification of his patent as follows:

"In the construction Fig. 4 the air-space likewise is shown as completely surrounding the conductor, notwithstanding the observation can be had from the top of the sheath or vessel only when the cover is removed. This is because I consider that for the best results in the practical use and operation of the fuse and the maintenance of a substantially uniform fusing point of temperature the air-space should completely surround the conductor even though the inspection, if provided for, be restricted to one side only. It will also be noted that in both the constructions Figs. 1 to 4, inclusive, the air-space is central of the length of the tube, and is relatively short as compared with the length of the tube. I have found this length and location of air-space to produce the best results, it best tends to concentrate the first blowing or rupturing point of the fuse within the air-space."

From what has been said of the Mordey patent, it is perfectly obvious that he had no conception of the Sachs invention. Practically the only features common to both Mordey and Sachs are an inclosed fuse-strip and a filling material, which latter Mordey says may be either of nonconducting material or air, preferably the latter. However, the severest criticism which can be made of the Mordey patent is that, although it had been published to the world for 10 years, its teachings did not appreciably advance the art, and the production of a reasonably safe and efficient safety-fuse remained an unsolved problem until Sachs after repeated efforts evolved the patent in suit,

whereupon the not uncommon attempt is made to interpret Mordey in the light of Sachs, which is not permissible.

More might be said, and indeed much more has been said by complainant's counsel, in distinguishing the patent in suit from the Mordey patent and others in the prior art, but it seems unnecessary to prolong this opinion for that purpose. As already intimated, the elements of Sachs combination claims were all old. Indeed, several of them had appeared in numerous prior patents; but the patentable novelty of such claims cannot be destroyed by merely showing that their several elements are old, and of this patent as an entirety complainant's expert has well said:

"No one in the art prior to the conception of Sachs set forth in the patent in suit had combined in one structure a thin flat strip of rapidly oxidizing metal embedded within and entirely surrounded and isolated by a filling material, which was in contact with a maximum amount of surface of the strip as the result of its thinness and wideness, and which strip was connected to terminals of relatively greater conductivity within the case which held the filling material about the strip."

That extract sums up the situation and fully expresses the ultimate opinion and finding of the court. The patent will be sustained.

Very little need be said upon the question of infringement. Apparently any fair-minded observer must upon inspection be satisfied that the defendant's fuses infringe the several claims of the patent in suit. Indeed, the devices which were held by the Circuit Court of Appeals of the Second Circuit, in Johns-Pratt Co. v. Sachs Co., supra, to infringe the patent in suit, and which are in evidence here, are so much like those of the defendant's manufacture as to be well-nigh indistinguishable.

A decree in the usual form will accordingly be entered in favor of the complainant, with costs.