**LADD v. W. & H. WALKER, Inc., et al.**

(Circuit Court of Appeals, Third Circuit. August 12, 1925.)

No. 3099.

1. **Patents** ⚖═261 — **Patentee of furnace for steam boilers held estopped from claiming novelty in high arch construction.**

Patentee of a furnace for steam boilers, concerned entirely with the combustion chamber, *held* estopped from claiming novelty in a high arch construction, so far as mere height was concerned, in view of repeated admissions that other patents embraced such feature.

2. **Patents** ⚖═246—**No infringement if one of elements described by patentee as essential is omitted without substitution of equivalent.**

There is no infringement of a patent if one of the elements described by the patentee as essential is omitted without the substitution of an equivalent.

3. **Patents** ⚖═61—**Patent, pending in Patent Office when patentee claimed to have made his invention, not in the prior art, but competent evidence on questions of priority and infringement.**

A patent, pending in the Patent Office when patentee claimed to have made his invention, though not in the prior art, constitutes pertinent evidence on the questions of priority of invention and infringement.

4. **Patents** ⚖═328—**Ritts' patent, 1,258,248, for a furnace for steam boilers, claims 1 and 3, held not infringed.**

Ritts' patent, No. 1,258,248, claims 1 and 3, for a furnace for steam boilers, to secure substantially complete combustion of the fuel before the gases are brought into contact with the boiler surfaces when the boiler is operated at maximum capacity, *held* not infringed.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Patent infringement suit by George T. Ladd against W. & H. Walker, Inc., and the Erie City Iron Works. From a decree of dismissal, plaintiff appeals. Affirmed.

Winter & Brown and Frederick W. Winter, all of Pittsburgh, Pa., for appellant.

Hugh C. Lord, of Erie, Pa., for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and RELLSTAB, District Judge.

RELLSTAB, District Judge. The patent in suit is for a furnace for steam boilers.

George T. Ladd, owner of Ritts patent, No. 1,258,248, granted March 5, 1918, charges the defendants jointly and individually with infringing this patent. The issues are invalidity and infringement.

The District Court dismissed the bill. It held the patent invalid because the subject-matter thereof was neither disclosed in the original application as filed nor supported by the inventor's oath, and for lack of novelty. It also held that, even if the patent were valid, it was not infringed by the defendants' furnace.

Ritts' general purpose in the alleged invention, as gathered from his patent, was to secure substantially complete combustion of the fuel before the gases were brought into contact with the boiler surfaces when the boiler was operated at maximum capacity. His patent is concerned entirely with the combustion chamber.

Of the three claims allowed by the Patent

Office, only two (1 and 3) are in issue before us. These, as they emerged after three submitted sets of claims were rejected, read as follows:

Claim 1: "The combination with a boiler consisting of an upper and a lower drum, and a plurality of sets or banks of tubes connecting said drums, baffles so arranged substantially parallel with the sets of tubes as to form a plurality of vertical and connected passes for the hot gases, a combustion chamber formed in part by the fire box and having its rear wall formed by one of the baffles and inclosing tubes of the first set or bank, means for introducing fuel into the fire box at a point remote from the first set or bank of tubes, and means for introducing air to promote combustion, said combined fire box and combustion chamber being of substantially uniform transverse dimensions for the entire height and having such a height as will permit a practically complete combustion of the gases, etc., before the gases pass from the combustion chamber."

Claim 3: "The combination with a boiler consisting of an upper and a lower drum, and a plurality of sets or banks of tubes connecting said drums, baffles extending the entire width of the boiler and projecting vertically from the respective drums for such a distance toward the opposite drums as to provide connecting throats between the adjacent passes formed by the baffles; a combustion chamber formed in part by the fire box and having its rear wall formed by one of the baffles and inclosing tubes forming the first set of banks, a stoking mechanism for feeding fuel into the fire box at a point remote from the first set or bank of tubes, and means for introducing air to promote combustion, said combined fire box and combustion chamber being of substantially uniform transverse dimensions for the entire height and having a height approximately equal to the distance between said drums."

None of the rejected claims contained the following elements: A combustion chamber "formed in part by the fire box," now in claims 1 and 3; "means for introducing fuel into the fire box at a point remote from the first set or bank of tubes," now in claim 1; a stoking mechanism for feeding fuel into the fire box "at a point remote from the first set or bank of tubes," now in claim 3.

The patent was issued on a substituted application. In the original application Ritts stated that the described invention related to "improvements in the construction of combustion chambers for vertical water tube boilers, employing a forced draft, as is generally necessary with underfeed stokers"; that, "when employing a forced draft, gases are generated more rapidly than under natural draft conditions, and, being under the influence of the air pressure under the grate and to the pull of the stack, the products of combustion are caused to move rapidly, and in the construction above described are brought into contact with the relatively cold tubes before complete combustion can occur"; that these combustion chambers were too confined "to permit of such an expansion of the gases, as is necessary for the complete combustion prior to the gases being cooled by contact with the cool tubes"; that "heretofore the upper portion of the front wall of the setting has been separated only a short distance from the first set of tubes, and the fire box or combustion chamber was wholly outside of this front wall, which was supported on the inner end of the top of the fire box, and all the products of combustion, on leaving the fire box, flowed through the narrow fluelike chamber, formed by the front wall of the setting and the baffling at the rear of the first set of tubes. The width of this chamber is substantially the same as that of the fire box, but its horizontal depth is less than half of that of the fire box, and, in addition to having an area greatly less than that of the fire box, the carrying capacity of this chamber is greatly reduced by the tubes of the first set or bank."

Ritts stated: That his invention "has for its object a construction of fire box permitting of a free expansion of the gases out of contact with the tubes, whereby a substantially complete combustion of the gas can be effected," and that, in lieu of the then existing "restricted fire box and chamber leading therefrom, this (Ritts) improved fire box and chamber are so constructed and arranged relative to the tubes that opportunity will be afforded for such an expansion of the gases generated as is essential to a complete combustion of the gases produced by the combustion of the fuel on the grate." That his "combined fire box and combustion chamber permits of the natural vertical movement of the gases from the bed of fuel on the grate, so that only the comparatively small quantity of gases generated from the fuel on the inner portion of the grate, in line vertically with the tube 3 (the set nearest the front wall of his chamber) will come immediately into contact therewith, and that the gases for (from) all other portions of the bed of fuel are free to flow up and expand as they are completely burned."

In answer to the Patent Office's second rejection of Ritts' claims, he filed substituted specifications and an amended set of claims. These specifications, after the rejection of the third set of claims, and after appeal to the board of examiners-in-chief, were amended by the insertion of the clauses relating to the combined fire box and combustion chamber and the feeding of fuel at a point remote from the heating surfaces of the boiler. Thus amended, these specifications, after eliminating therefrom matters not essential to the issues discussed herein, are as set forth in the Ritts patent. The amendments referred to were considered by the board as excluding the citations relied upon by the examiner in rejecting the claims, and on its recommendation the amendments were admitted and the claims allowed. The dismissal of the appeal and the granting of the patent followed without any further examination by the primary examiner, to ascertain whether the claims as amended fell within the scope of other patents or pending applications for patents. The substituted specifications, as well as the amendments made after the appeal was taken, in several respects greatly differ from the specifications as originally filed. Some of these differences presently will be mentioned.

The appellees contend before us, as they did in the District Court, that the new matter set up in the substituted specifications and the subsequent amendments thereto, and for the first time inserted in the amendment to the claims before the board of examiners-in-chief, is the essence of the invention, and, not having been disclosed in the original application, constitutes a departure and makes the patent void. The District Court, as noted, sustained this contention.

In the substituted specifications, Ritts stated the object of his invention was "to provide a fire box or combustion chamber of sufficient size and of such transverse shape as will permit of the natural upward movement of the gases from the grate and their expansion, thus promoting combustion of all gases and finely divided solid material carried up by the gases; said combustion chamber being so disposed relative to the first bank of tubes that they will be uniformly heated from end to end and all local heating avoided."

From both of Ritts' specifications, it is evident that, both as to the problem attacked, and the apparatus he put forward to be used in solving it, he had in mind a fire box with a grate at the bottom thereof. Also the use of lump fuel fed at the bottom of the furnace, instead of pulverized fuel fed at the upper part of the furnace, therefore, would seem to have been in his mind. There is nothing in Ritts' specifications which suggests the use of pulverized fuel. Indeed, without a radical change in structure, such fuel could not be successfully used.

In both of these specifications, Ritts asserted that theretofore it had been customary to employ a combustion chamber having a height not substantially greater than one-third, and in some cases one-half, of the height of the chamber in which the boiler proper is located.

Long before Ritts conceived the improvement in issue, it was well known in the pertinent art that a premature contact of the burning gases with the relatively cold water tubes would retard, if not prevent, complete combustion of such gases, and that the avoidance of this premature contact was a matter of furnace construction. As early as 1909, T. H. McGraw, one of the defendants' witnesses, and an employee of the defendant Erie Company, with 20 years' experience as a salesman of that company's boilers, engines, and pulverizers, in an article read before an assembly of engineers, stated there was a "necessity for constructing a furnace in such a way that the cold tube surfaces are kept away from the fire until the process of combustion has been sufficiently advanced so as not to be affected by such contact. In other words, burn the fuel and liberate the heat units first, and bring them in contact with the water surfaces afterwards."

On page 17 of the 1915 catalogue of the Combustion Engineering Company, which subsequently took out a license under the Ritts patent, under the head of "Smokeless Operation," it is stated that "to insure the complete elimination of smoke under varying rates of combustion, certain conditions must be fulfilled, among which are * * * a combustion space of sufficient height to permit the combustion of the volatile gases before the flame enters between the boiler tubes."

The evidence shows that in the earlier stages of the art the arches, or the roofs over that part of the furnace where the coal was burned, were comparatively low. The Dutch oven type was the one then generally in use. In the rating—evaporation of water per square foot of heating surface per hour—then commonly used, it was thought desirable to have the arch sufficiently close to the grate to assist in the ignition and com-

bustion of the fuel burning on the grate. The Milne patent, No. 997,668, shows this type of arch, being similar in its arch function to the Sterling, No. 407,260, and Pell, No. 539,189, structures. In the course of time, larger ratings were demanded, due mainly to the development of the art of stoker firing. To meet this call for increased ratings, the engineers progressively increased the size of the furnace and particularly the height of the arch above the grate; the particular load the boiler was intended to carry virtually regulating the exact height of the arch.

The testimony amply sustains the learned District Judge's opinion, viz.: "That in the ordinary furnaces burning coal, such as the Ritts furnace, the height of the arch is merely an engineering proposition, and is adjusted by all engineers according to the rating or the crowding to which the furnace is to be subjected. The undisputed evidence in this case is that the early furnaces were very low over the grate surfaces and that there has been a gradual raising in the height of these furnaces as the ratings of the boiler were increased. * * * We find as a matter of fact, that there has been a progressive lifting of furnace arches as the ratings of boilers have been increased. The increase in the height of the furnace is merely the engineer's answer to the development of the coal stoker. As it became possible to crowd more fuel and air into the ignition chamber, it became desirable to raise the arch, but not before."

As noted, the largeness of the combustion chamber, in which height was stressed, was the chief characteristic of Ritts' first set of claims. Height was measured by the upper and lower drums.

Milne's patent, No. 877,355, figured in all of the examiner's rejections of the three sets of claims submitted by Ritts. The structure disclosed by this Milne patent consists of three upper and three lower drums connected by banks of tubes, with three baffles located, respectively, between the rows of tubes. It has a grate and fire box located below the lower drums. The furnace is of the full length of the setting, and the gases and products of combustion rise vertically from the grate, nearly the full height of the setting, come in contact with the tubes on both sides of the furnace, and pass through the various passes of the boiler to the stack.

In answering the first rejection, and in submitting his second set of claims, Ritts asserted that Milne showed "a two-unit con-

struction with the fire box and combustion chamber intermediate these units," and that the claims as now drawn were "limited to a construction having the fire box entirely at one side of the boiler proper." He also asserted that the examiner's other citations were not pertinent.

These claims also were rejected on two patents to Milne—the one referred to in the first rejection, and another, No. 806,902, and Edgar, No. 732,723. Ritts' answer to this second rejection was the submission of the substituted specifications referred to and of the third set of claims.

In his argument in support of this modification, Ritts stressed the advantages and benefits incident to his high arch combustion chamber. With reference to the Edgar citation, he made no other comment on the high arch furnace shown in his construction than that the Edgar structure would not give any of the benefits to be obtained from the Ritts high arch combustion chamber. As to Milne, No. 877,355, he again pointed to the fact that it was a two-unit construction to accomplish the beneficial results purposed by him (Ritts) in his "single unit boiler." He also stated that boilers of the Milne type "of necessity have a very large capacity, and the fire box is made high in order that combustion may be completed in the travel of the gases before they intermingle with the tubes"; that it was the purpose of his (Ritts) invention "to provide a boiler unit of relatively small capacity in which the advantages incident to a high arch or combustion chamber, as shown in the patent, can be attained."

Here, it is noted, Ritts recognized that the Milne patent discloses an enlarged and high fire box with his type of boiler, his criticism being that Milne applied it to a double boiler; and he made no comment on the Edgar showing of a high combustion chamber applied to a single unit, other than that "none of the benefits incident to a high arch combustion chamber, as set forth herein (Ritts' specifications), can be obtained from the Edgar construction."

The examiner's response to Ritts' third effort was a rejection of all the claims "on the patent to Milne, 877,355, of record, either taken alone or in view of the patent to Edgar of record." With reference to Ritts' "inclusion of the mechanical stoker as an element in these claims," the examiner said that it "cannot serve to patentably distinguish them from the art cited above, since

the use of mechanical stokers in water tube boiler furnaces is notoriously old."

In Ritts' argument on appeal, he admitted that Edgar's "fire box and combustion chamber are very high," but contended that his (Edgar's) "construction is wholly inefficient, for the reason that it would be practically impossible to cause the gases to flow from the fire box into and among the lower ends of the tubes on account of the natural tendency of the heated gases to rise."

With reference to Milne, 877,355, he again admitted that it showed "a construction and arrangement whereby some of the benefits derived from the construction at issue are attained, but only in connection with two boilers forming a large unit of a battery of boilers," and reasserted that "it is one of the objects of the invention claimed herein to provide a small unit in which will be embodied a construction permitting of the efficient heating incident to the construction of large double units shown in the patent cited."

[1] With these repeated admissions of the Milne and Edgar disclosures and attempted avoidances thereof, Ritts is estopped from now claiming novelty in a high arch construction, so far as mere height is concerned.

As to the last amendment to the claims, relating to feeding fuel into the fire box at a point remote from the first set of tubes: Obviously this amendment, an added limitation to the combination, was to avoid the Milne, No. 877,355, structure, in which the firing is adjacent to, and not remote from the tubes. This amendment contains the first suggestion, that the part or place where the fuel is to be introduced, in relation to the boiler surfaces, was either important or a part of Ritts' contribution to the art. In structures such as disclosed by Ritts, the remotest point from the first set of tubes would be at the front of the furnace. But such feeding of the fuel is not new, as that was the place ordinarily used for the introduction of fuel. As already noted, the primary examiner did not pass upon the novelty of this element. It was born of the discussion on the appeal from the third rejection of the claims, and was allowed on the recommendation of the board of examiners-in-chief, without encountering any scrutiny from the primary examiner.

The question of departure from the original disclosures, arising from these added features in the substituted specifications, is serious; but we find it unnecessary to decide that question or the equally serious one of invention, for the reason that we are convinced that, even if the appellant's patent were held valid, the defendants' structure does not infringe it.

Whatever merit the Ritts improvement may possess, the state of the art entered by him forbids giving it a controlling position in the burning of fuel, which is the crucial issue in this case. All of the elements of the Ritts claims are old, and the structure produced as a result of the combination, as described in his specifications, possesses limitations not found in the alleged infringing furnace. The Ritts structure has and requires a grate at the bottom, upon which the fuel is fed. Without a grate so located, the described structure would be functionless. The fuel fed on the grate remains stationary during ignition, and the air to aid in ignition and combustion is forced through the grate from underneath, and through the bed of fuel supported thereby, by means independent of that which introduces the fuel. The initial flow of the gases liberated in the burning is naturally upward, and that which is downward, as testified to on behalf of Ritts, is inconsiderable and takes place, not intentionally, but because some of the gases are cooled by a premature contact with the water tubes and by reason thereof change their direction and flow downward.

The alleged infringing furnace was installed at the Walker plant. It burned powdered fuel, which was introduced by an air blast at the top of a grateless combustion chamber. The fuel, not being fed onto a grate, is not stationary during ignition; the air to aid in ignition and combustion is not introduced by means separate and independent of those used for feeding the fuel into the furnace; and the initial flow of the gases liberated in the burning is not upward.

In this furnace we have no "natural upward movement of the gases from the grate" (lines 79-80, p. 1, of patent), nor a construction arranged "to feed the fuel through the front wall of the fire box or wall most distant from the first bank of tubes, and hence the gases generated by the combustion of the fuel on the grate surfaces will flow directly upward" (lines 50-55, p. 2, Id.), nor "such a combined fire box and combustion chamber" that "the gases will rise up vertically from the points where formed" (lines 59-61, p. 2, Id.) On the contrary, the ignition takes place while the fuel is in suspension, the initial flow of the gases is downward, and the only upward flow takes place after

the flame has passed the U-bend near the bottom of the furnace. Obviously, where pulverized fuel is introduced at the top by a blast of air which supplements gravitation and accelerates the initial movement of the fuel downward, and where the fuel is to be combusted while in suspension, the furnace must be of large capacity to accommodate the extended movement of the fuel and evolved gases and to permit of the required combustion.

But the conception or construction of great capacity does not constitute invention. A furnace must correspond in size to the amount of fuel that is to be burned at a given time, and, as already noted, long before Ritts, the demands for larger ratings were met by enlarging the furnace capacity; the engineers ever keeping in mind, in fixing the space for burning, the obvious fact that complete combustion (the ever-present desideration) depended upon the amount of fuel and air that could be brought into ignition relation.

Furthermore, in appellees' structure there is no downward flow of cooled gases, deflected outwardly into gases moving up from the fuel bed, to be regenerated by the hotter gases. As noted, in appellees' structure the fuel is shot into the furnace at the top by a blast of air, ignition and partial combustion results, and the fuel falls downward, and the expansion of gases during this movement causes their rapid movement on the U-bend, a radically different movement from the "natural upward movement" indicated in the Ritts patent. Again, the upward movement in appellees' structure takes place in the rear of the furnace, not in the front as described in the Ritts patent.

In our judgment, the appellees' furnace does not respond structurally or functionally to Ritts' patent. The claims call for a "combustion chamber formed in part by the fire box." The Walker installation has no such element. While we recognize that in a broad sense a fire box and a combustion chamber may be considered as one and the same, yet in the Ritts patent these two things, which may be separate and have different functions, were purposely combined and inserted for the first time in the third set of claims, by amendment after the appeal was taken from the third rejection of the claims. Reading together the original and substituted specifications and the amendment referred to, we are compelled to conclude that Ritts did not treat them as one and the same, but that he was purposely tying together these two things capable of having different functions into one element. True, the line of demarcation between the two is not defined, but, taking the whole specifications into consideration, we think that the part which contains the stationary bed of fuel was meant by him to be the "fire box," while the space above the fuel bed where combustion of the evolved gases naturally takes place, was his "combustion chamber."

The Walker installation, being a pulverized fuel-burning furnace, as already noted, has no grate, and needs no specific means to support a fuel bed. The burning fuel is not intended to rest on anything, but always to be in suspension. The term "fire box," as a specific thing, is inapt when applied to such a furnace, but perfectly apt when lump fuel, necessarily stationary during ignition, is to be burned, and from which there is to be a "natural upward movement of the gases" as described by Ritts.

The claims also call for separate means "for introducing fuel into the fire box" and "for introducing air to promote combustion." The Walker installation, as noted, has but a single element designed to accomplish both of these functions. The air that brings the fuel into the furnace also promotes combustion. True, in addition to the element last referred to, this installation has a series of ports for the introduction of air. These are openings into an air space between the outer and inner walls of the furnace. Some of these are near the top, others near the bottom, and still others between 5 to 6 feet from the latter. However, these ports are not designed as aids for combustion, but to protect the inner fire brick walls of the furnace, and to maintain a lower temperature at the bottom of the furnace to prevent the fusing of the ash which accumulates there. Such functions are radically different from those which aid combustion, and which openings or ports from the evidence are more likely to be detrimental than beneficial in the matter of combustion.

[2] It is well-settled law that there is no infringement if one of the elements described by the patentee as essential is omitted without the substitution of an equivalent. Imperial Bottle Cap & Machinery Co. v. Crown Cork & Seal Co. (C. C. A. 4; July 7, 1905) 139 F. 312, 323, 71 C. C. A. 442; Levy v. Harris (C. C. Pa.; June 3, 1903) 124 F. 69, affirmed (C. C. A. 3; June 8, 1904) 130 F. 711, 65 C. C. A. 113; Evans v. Hall Printing Press Co. (C. C. A. 2;

April 13, 1915) 223 F. 539, 542, 139 C. C. A. 129; Underwood Typewriter Co. v. Royal Typewriter Co. (C. C. A. 2; May 12, 1915) 224 F. 477-479, 140 C. C. A. 163; McCaskey Register Co. v. Mantz (C. C. A. 2; May 12, 1915) 224 F. 495, 496, 140 C. C. A. 203; Firestone Tire & Rubber Co. v. Seiberling (C. C. A. 6; Dec. 13, 1918) 257 F. 74, 78, 168 C. C A. 286; Russell Grader Mfg. Co. v. Zeig Mfg. Co. (C. C. A. 6; June 3, 1919) 259 F. 575-577, 171 C. C. A. 33.

As noted, the alleged infringing furnace does not possess "a combustion chamber formed in part by the fire box" nor separate "means for introducing air to promote combustion." The absence of the latter element alone, under the authorities, avoids infringement, as appellees' means, which perform the double function of introducing both fuel and air, cannot be held to be an equivalent to which Ritts is entitled.

The learned District Judge held that "the Bell patent, No. 1,184,302, issued May 23, 1916, on application filed August 4, 1911, is more like the structure of the defendants than the defendants' is like the structure of Ritts' patent." It is noted that the application for the Bell patent was pending in the Patent Office at the time Ritts claimed to have made his invention.

The Bell invention was for an improvement in steam generators in which pulverized coal was to be used as the fuel. The furnace is of equal cross-dimension from top to bottom, and the combustion chamber is of a height equal to the tubes. A curtain or ribbon of fine fuel, extending entirely across the furnace, is fed into the top of the furnace at a point remote from the boiler surfaces. The fuel is burned in suspension, and first moves downward; at or near the bottom it makes a U-bend and moves upwardly to the top of the combustion chamber and passes out. The tubes at the left of figure 1 are tubes which face into the furnace, with a baffle immediately back of them which seemingly satisfies the structural requirements of the Ritts patent, and the fuel is fed at a point remote from these tubes. One of the advantages claimed by Bell for his invention was the doing away with grates by burning the powdered fuel in suspension.

[3] As the bell patent was not issued until after Ritts filed his application for the patent in issue, the Bell patent was not in the prior art (Johns-Pratt Co. v. E. H. Freeman Electric Co. [C. C. A. 3] 204 F. 288, affirming [D. C.] 201 F. 356, and cases cited by Judge Cross in that case at page 360); but, while this is true, and while the Bell patent cannot be used as an anticipation, it is pertinent evidence on the questions of priority of invention and infringement. A comparison of the Bell furnace with the Ritts claims suggests that the elements comprising the Bell structure read literally on Ritts' claim 1 and equivalently on such of the elements of claim 3 as cannot be read literally thereon. However, as already stated, we do not think it necessary to determine the question of invention.

Functionally considered, the Bell patent deals directly with the method of burning powdered fuel for steam-making purposes. Ritts does not teach anything on this kind of burning. Bell teaches the burning of fuel in suspension, in a grateless furnace; the introduction of fuel at a point remote from the boiler surfaces; the feeding of fuel and air by a single means; the ignition and initial combustion of the fuel on the downward movement; the U-bend at or near the bottom, permitting of an upward movement of the gases—all while the fuel and gases are in the combustion chamber.

Structurally and functionally, the appellees' furnace follows Bell and not Ritts. The Bell patent could have been made the basis for interference proceedings with Ritts, if the primary examiner had futher considered Ritts' application, as he undoubtedly had the right to do, after the amendment offered by Ritts at the hearing of the appeal had been allowed. However, no such proceedings were had, probably because of the recommendation of the board of examiners-in-chief that Ritts' amendments offered on appeal be allowed and the patent granted.

[4] What would have been the effect on the Ritts application if such proceedings had been instituted, or if the primary examiner had made further investigation after the amendments were allowed by the board of examiners-in-chief, of course, is purely speculative. However, it suffices to say that, on the record before us, we find that the Walker structure does not infringe Ritts' patent, and on that ground the judgment of the District Court is affirmed, with costs.