CLEVELAND AUTOMATIC MACH. CO. v. NATIONAL ACME CO.

No. 5677.

Circuit Court of Appeals, Sixth Circuit.

Oct. 9, 1931.

John Weld Peck, of Cincinnati, Ohio (Fay, Oberlin & Fay and A. M. Brown, all of Cleveland, Ohio, on the brief), for appellant.

C. A. Weed, of New York City (Thompson, Hine & Flory, of Cleveland, Ohio, and Dolle, O'Donnell & Cash, of Cincinnati, Ohio, and Kwis, Hudson & Kent, of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN and HICKS, Circuit Judges, and HOUGH, District Judge.

HICKS, Circuit Judge.

Suit upon alleged infringement of patent No. 1,092,462, for a Metal Working Machine, granted April 7, 1914, to Enoch Trobeck, and assigned to appellee. Claims 3, 4, 5, 12, and 13 are involved. The defenses were: (1) Lack of invention; (2) anticipation by prior patents, uses, and publications; (3) that the specifications of the patent are incomplete, uncertain, and ambiguous; and (4) noninfringement. The District Court held all the claims valid and infringed.

Claims 3, 4, and 5 are built around (1) a bed; (2) a work carrying head; (3) a sliding tool carrier; (4) a shaft carried by either the work head or the tool carrier, and extending into the other; and (5) a tool support mounted on said shaft between the work carrier and the tool carrier. The principal elements of claim 12 are: (1) A bed; (2) a sliding tool carrier mounted thereon; (3) a work spindle carrying head; (4) a nonrotatable member extending into said work spindle head from the tool slide and adapted to securing turning tools thereto. Claims 3 and 12 are printed.[1]

The Trobeck patent relates to multiple spindle screw machines for the automatic production of metal screws, nuts, bolts, spindles, and other related articles. These multiple spindle automatic machines had their origin in the ordinary lathe and the single spindle automatic machine. Before Trobeck, the familiar type of multiple spindle automatic was one having a longitudinally extending bed, and upon one end thereof a work carrying head upon which was mounted a multiple of work carrying spindles (usually four) arranged about and equidistant from the axis

[1] "3. In a machine of the class described having a bed, the combination with a work carrying head, of a sliding tool carrier mounted on the bed, a shaft carried by one of said parts and extending into the other of said parts, said shaft and the part into which it extends having a sliding movement relatively one to the other, and a tool support mounted on said shaft between said head and said sliding tool carrier.

"12. In a multiple spindle screw machine having a bed, the combination with a sliding tool carrier mounted on the bed and with a work spindle carrying head, of a nonrotatable member extending into said work spindle head from the tool slide and adapted to have turning tools secured thereto."

of the machine, and upon the other end thereof a turret supporting a plurality of tools (usually four) likewise arranged about and equidistant from the axis. In some forms, the turret revolved to bring the tools into operating relationship with the work on the spindles; while in others, the work carrying spindles rotated or indexed to bring the work into proper relation with the tools. In some forms, the work head reciprocated longitudinally on the bed causing the work to travel to and from the stationary tools; while in others, the tool carrier was the moving member causing the tools to travel to and from the work.

Trobeck conceived, or at least thought he had conceived, an improvement upon the ordinary multispindle machine. He used the type of multiple tool carrier arranged to slide through guides upon the bed of the machine. Attached to the inner face of the tool carrier by means of bolts and spider arms was an axial extension called a "central tool carrier." To avoid any overhang thereof, and to give rigidity thereto, he provided a tubular member as a support. It was fashioned to encircle the drive shaft, and inserted longitudinally and axially through the central tool slide and was attached thereto, and, sliding therewith, entered the head of the work carrier. The central tool carrier as ordinarily constructed had four sides each with a longitudinal slot thereon arranged for receiving and holding turning or other nonrotatable tools.

We think it manifest that this arrangement presents distinct advantages, and involves more than mere mechanical skill. The box or turning tool was removed from the tool turret and attached to the extension or central tool carrier. There was a resultant shortening of the tool shank, and a consequent reduction in the chattering or vibration incident to the use of a long shank. The merit in this is obvious, when it is remembered that the machine work upon the products of these devices must be substantially accurate, i. e., within two and a half thousandths of an inch, or less than a hair's breadth of a precise fit. The drilling or boring must be executed with extreme care and steadiness to prevent the slightest variation or "out of round."

Further, before Trobeck, when it was required to both bore and turn the work at the same time, it was necessary to fix the drill into the hollow shank of the turning tool or, vice versa, to fix the turning tool into the shank of the drill, and, as the turning tool did not rotate, the drill could not. The drilling as well as the turning was accomplished by the rotation of the work spindles, but each was retarded because the work spindles alone revolved. But Trobeck attached the turning or box tool to the central tool slide or extension, and left the drill projecting from the main tool slide. It thus became free, and by suitable gearing was made to rotate independently of the turning tool. With the drill and the work spindle each rotating in opposite directions, the time required for the operation on each spindle was substantially shortened.

Further, if it was desired, additional box tools could be attached tandem to the central tool slide, and, in case of heavy side cutting or turning, rollers or steady-rests could be attached to minimize the incidental vibration.

■■ The Trobeck patent was acquiesced in except by appellant, and even by it for more than ten years and until it built and sold an admittedly infringing machine to the Federal Screw Company in November, 1924. The patent is prima facie evidence of its utility, and, if we entertained any doubt of its practical usefulness, appellant, having in its answer admitted infringement, is estopped from denying it. Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939; Westinghouse Co. v. Wagner Mfg. Co., 225 U. S. 604, 616, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653; Seymour v. Ford Motor Co., 44 F.(2d) 306, 308 (C. C. A. 6).

■ It is urged that "high speed drilling," that is, the simultaneous rotation of the drilling tools and the work in opposite directions was an afterthought with Trobeck, and was not described in the specifications of his patent. We think it is sufficiently described. The specificaitons state that the object of the invention is to provide means by which "additional as well as better work may be done along certain lines. * * *" It is also stated "preferably the central tool holder 9 is constructed and arranged in such manner that the tool spindles remain free and can be used for internal work or drilling simultaneously with the outside turning." This necessarily means that the drill and the work may rotate in opposite directions for drilling simultaneously with the outside cutting or turning operation. But this is not material. This "high speed" function was present in the Trobeck attachment, whether sufficiently described or not, and contributed to its usefulness, and we think the patentee should have such construction of the specifications and

claims as will protect his invention. McCormick Harvesting Mach. Co. v. C. Aultman & Co., 69 F. 371, 378 (C. C. A. 6); Goshen Sweeper Co. v. Bissell Carpet-Sweeper Co., 72 F. 67, 74 (C. C. A. 6); Kellogg S. & S. Co. v. Dean Electric Co., 182 F. 991, 998 (C. C. A. 6).

We give little weight to the argument that the limited manufacture and sale of the Trobeck improvement indicates its inutility. Failure to manufacture and sell the patented device does not always negative utility. Appellee, as assignee of Trobeck, did manufacture a limited number of these attachments. It retained a few of them for use at its own plant, and sold from fifty to a hundred of them in Germany and other foreign countries. It does not appear that appellee sold any in this country, but it was not obliged to make, use, or sell the Trobeck invention. Woodbridge v. U. S., 263 U. S. 50, 55, 44 S. Ct. 45, 68 L. Ed. 159; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 424, 28 S. Ct. 748, 52 L. Ed. 1122; Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 77 F. 288, 295, 35 L. R. A. 728 (C. C. A. 6). It was itself a large manufacturer of such products as nuts, bolts, and screws. The patent was its property, and it had the legal right to prevent its use by competitors if it so desired.

Appellant's experts do not point out any prior use, publication, or patent which they are willing to stand upon as an anticipation, and we find none. Appellant's expert admits that the nearest approach thereto is the patent to Gridley, No. 904,866, issued Nov. 24, 1908. The Gridley device does have a "sliding tool carrier," as does Trobeck, but this sliding tool carrier of Gridley is not mounted "on the bed" as in Trobeck. It is supported by a rotatable tubular sleeve as distinguished from the nonrotatable sleeve in Trobeck, and is in turn mounted upon the driving shaft. Remove the sleeve and shaft and the Gridley sliding tool carrier falls. Appellant designates the Gridley sliding tool carrier as a "main tool slide." This is manifestly an effort to identify it as the equivalent of the "sliding tool carrier" of Trobeck, but upon such assumption it necessarily follows that there is absent in Gridley either the "tool support" of claims 3, 4, 5, and 13 of Trobeck, or the member adapted for turning tools found in claim 12 of Trobeck. In short, the Gridley patent has only one tool holder. With reference thereto, appellant's expert says: "I do not consider that the Gridley patent 904,866 has a *main tool slide* mounted on the bed of the machine, and adapted to carry end working tools, and between that main tool slide and the work carrier a *central tool holder* which is adapted to carry *side working* tools if that language is strictly construed." (Italics ours.)

The specifications of the Gridley patent show that it was not designed to do the "high speed" work of Trobeck, and the testimony of the expert makes it clear that it could not do so unless "operating tools * * * are mounted in the end frame or end plate 42 of the machine and are entirely independent of the tools mounted on the reciprocal tool carrier 52." Whether this could have been done is problematical. It had not been done previous to Trobeck as a matter of fact. See Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 434, 31 S. Ct. 444, 55 L. Ed. 527.

The patents to Prentice, No. 874,035, December 17, 1907, and to Landman, No. 407,-537, July 23, 1889, are advanced as approximately showing the Trobeck construction. We cannot agree. Both of these patents were cited as references when the Trobeck device was before the Patent Office. In the Prentice machine, the work carrier does not rotate. In Trobeck, it does. In Prentice, the tool carrier does not slide, while in Trobeck it does. Unlike Trobeck, Prentice has no tubular sleeve supporting a central tool carrier. In Landman, the work holder is stationary and the tool carrier rotates, while in Trobeck the main tool slide does not rotate, but the work holder does rotate or index.

We have considered all other references to the prior art, but, in view of the acknowledgment of appellant's expert that the Gridley patent is the nearest approach to anticipation, we do not regard these additional citations of such importance as to require discussion.

Noninfringement is suggested rather than urged, and we do not think a detailed discussion of this issue is required. A general statement will suffice.

As heretofore indicated, appellant in November, 1924, made and sold to the Federal Screw Company a machine which admittedly infringed, and to protect itself appellant at that time sought a license under the Trobeck patent. The license was not granted. Some time thereafter, and before suit, appellant manufactured and sold one machine to the Packard Motor Car Company, one machine to the Willys-Morrow Company,

and various other machines such as are illustrated in its advertisements carried in the "American Machinist" under date of January 26, 1928, May 10, 1928, and October 25, 1928, respectively. As we read appellant's answers to appellee's interrogatories, they embody an implied if not a frank admission that these machines infringed. The claims in question are easily read thereon. Appellant's device does the same work in substantially the same way, and accomplishes substantially the same result as the machine of the Trobeck patent, and this is infringement. Gordon Form Lathe Co. v. Walcott Mach. Co. (C. C. A.) 32 F.(2d) 55, 61. There is no substantial difference between the construction of the Federal Screw Company machine and the subsequent machines made and sold by appellant, except that in the former the central tool holder was inserted into the main tool slide and secured thereto radially instead of being attached to the outside thereof and fastened longitudinally as in Trobeck. In other words, the only difference was the manner in which the central tool holder was attached to the main tool slide. Again, in Trobeck, the sliding tool carrier is mounted on the bed of the machine between guide bars, and controlled by flanges upon the bars. In appellant's construction, the corresponding sliding tool carrier is mounted upon the bed by means of a cylindrical arrangement which serves as a guide. These differences in form and shape do not negative infringement. Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935; McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 F. 716, 723 (C. C. A. 6).

It is suggested that the element of appellee's claims 4 and 5, to wit, "a non-rotatable shaft carried by one of said parts and extending into the other of said parts," is not found in appellant's construction. We think the counterpart of this element is found in appellant's machine in the nonrotatable tubular sleeve extending from the work carrier through the central tool slide and the main tool slide and supported at its opposite end by a bracket. This sleeve acts as a bridge between the central tool slide and the work carrier and gives rigidity to both, which is the exact purpose of the corresponding Trobeck claims. Appellant insists that this tubular sleeve was designed only to prevent chips and cuttings from falling upon the drive shaft. Unquestionably it accomplished this purpose, but we are not persuaded that it was primarily designed for this purpose, or that it accomplished no other. To be at all effective, it was necessary that appellant's central tool slide have some character of support in addition to its attachment to the main tool slide, and none is given it except the tubular sleeve. This sleeve of expensive construction is made of hardened steel accurately finished, and in appellant's advertising matter is indicated as a support. It passes through bronze bushings in the central tool slide as well as through the main tool slide with such scant clearance as to evidence its purpose as a guide or support. The fact that in addition thereto it serves as a protection to the shaft will not avoid infringement. Rockwood v. General Fire Extinguisher Co., 8 F.(2d) 682, 688 (C. C. A. 2); Johns-Manville Corp. v. Nat. Tank Seal Co., 49 F.(2d) 142, 146 (C. C. A. 10).

Decree affirmed.