## McKAYS CO. v. PENN ELECTRIC SWITCH CO.

### No. 9329.

Circuit Court of Appeals, Eighth Circuit.

Aug. 3, 1932.

G. H. Braddock, of Minneapolis, Minn. (Reif & Braddock, of Minneapolis, Minn., on the brief), for appellant.

W. P. Bair, of Des Moines, Iowa (Bair, Freeman & Sinclair, Will Freeman, and Earl M. Sinclair, all of Des Moines, Iowa, on the brief), for appellee.

Before STONE and KENYON, Circuit Judges, and OTIS, District Judge.

KENYON, Circuit Judge.

Parties will be designated as in the trial court. Plaintiff-appellant is the owner by assignment from the Vaile-Kimes Company of a patent, No. 1,195,232, for an improvement in automatic cut-outs for electric motors, which was granted August 22, 1916, to said company as assignee of Hugh W. Kimes, applicant. It will be herein termed the Kimes patent. This action is brought against the Penn Electric Switch Company, appellee, for alleged infringement of claims 1, 2, 3, 8, 11, and 12 of this patent. The alleged infringing device is constructed under Penn patent, No. 1,520,258, for an electric switch, granted December 23, 1924. Defendant-appellee is the owner of said patent. The trial court found that defendant's switch did not infringe said claims and dismissed the bill of complaint.

Two propositions are here argued: (1) The validity of the Kimes patent; (2) the question of infringement. The trial court did not pass on the first question. We find it unnecessary to do so.

The Kimes device is an automatic quick-acting switch mechanism to start or stop the electric motor used in connection with pressure water pumps in water distribution systems to maintain pressure in the tanks where the water is stored under air pressure. The purpose and intent of the Kimes structure may best be shown by reference to the patent. We set forth some paragraphs of the application:

"This invention relates to automatic cut-outs for electrical motors and more particularly to a pressure controlled cut-out for the motor of a pump used in connection with a water distribution system in which the water is stored in a tank under air pressure, which pressure serves to distribute the same through the system.

"The object of the invention is to provide a device of this kind which will positively break and make the circuit and in which the contact member will be moved quickly out of contact with and away from its cooperating contact member so that there will be little or no sparking and no burning of the contacts.

"It is also an object of the invention to provide a device of this kind which will be simple in its construction and operation, thereby enabling it to be manufactured and marketed at a comparatively low cost and simplifying the upkeep of the same."

Figure 2 of the drawings of said patent illustrates the workings of the device. It presents conditions when contacts 16 and 17 are open.

This shows a base 1, a fixed lower wall 2, a flexible upper wall 3, constituting a diaphragm, the two making a chamber connected by a conduit 4 with the pressure tank, the diaphragm being subject to the pressure of the air within the tank. There is a frame of two members 5, extending upwardly from the base and connected by a cross member 6. Between the side members of the frame is a plunger 7, having at its lower end an enlarged base 8, which extends through an opening 9 in the base 1 of the frame and rests upon the diaphragm 3. Coiled about the plunger is a spring 10. The top wall is provided with an adjustable part (screw plug 12), having an opening to receive the upper end of the plunger and having its lower end in engagement with the spring 10 to regulate the tension thereof. The tension of this spring prevents upward movement of the plunger 7 until the pressure in the tank and in the chamber beneath the diaphragm reaches a certain predetermined point. When this is reached the coil spring yields and permits the plunger to move upward and the diaphragm 3 retains the plunger 7 and the lever 22 in their upward position until the pressure in the tank so falls as to permit the spring 10 to move the plunger downward. The controlling device comprises a pivotally supported controlling lever 22 with a roller on the end thereof responsive to manipulation of the diaphragm 3 and in turn manipulating the actuating device, which is described in the patent as follows:

"* * * The actuating device or arm 18 has a laterally extending portion 28 to which is pivotally connected one end of a lever 29 which extends transversely to the arm and has a tapered nose 30, the converging sides or surfaces of which extend beyond the lower edge of the arm, which is bifurcated to receive the lever. The arm is provided with a radially extending socket or recess in which is mounted a spring 33 which is confined between the end of the socket and the arm 29 and serves to hold the nose 30 yieldably in engagement with the end of the controlling lever. * * * The instant the end of the controlling lever passes the apex of the tapered nose the other surface of the latter will engage the end of the controlling lever and the pressure will be in a direction to move the actuating arm about its axis in a direction to close the contacts. It will be noticed that either one side or the other of the nose 30 will exert a pressure against the end of the lever 22 according to the position of the lever, this pressure being due to the compression of the spring 33. This results in the nose being cammed to one side or the other, accordingly carrying with it the pivoted arm to which it is attached. It will be noted that this movement of the actuating device takes place instantly upon the passing of the controlling lever and regardless of the further

movement of the controlling lever. The controlling lever is provided in its outer end with a roller 31 with which the tapered nose 30 of the actuating arm engages and which has not only the usual functions of an anti-friction roller but also serves to prevent the apex of the nose from hanging on the end of the roller. The actuating device or arm is provided with a laterally extending stop 32 which is arranged between and cooperates with the stops 26 and 27 to limit the movement of the actuating device about its axis and to hold the same immovable during the compression of the spring 33 and the initial movement of the controlling device."

The operation of the contact members 16 and 17 is as follows:

" * * * As the controlling device moves from one position to another the actuating device is not moved but is retained in its position until the controlling device passes a central point and then the spring of the actuating device causes the same to move about its pivotal center and thus impart movement to the contact member."

The specifications contain fourteen claims. The claims alleged to be infringed are as follows:

"1. In a device of the character described, contact members, one of which is movable, an actuating device for said movable contact member comprising a movable member and a spring-controller part provided with converging surfaces constituting cams, and a controlling device comprising a pivoted lever arranged to move from one cam surface to the other across the converging ends thereof, said spring normally exerting a force to move said part toward the lever, whereby the movement of the lever from one surface to the other first tensions the spring and then causes the part to exert a cam action against the lever to actuate the movable member.

"2. In a device of the character described, fixed and movable contact members, an actuating device for said movable contact member comprising a movable member and a spring controlled part mounted thereon and provided with converging surfaces constituting cams, a pivoted controlling lever arranged to move from one cam surface to the other across the converging ends thereof, said spring normally exerting a force to move said part toward the controlling lever, whereby the movement of the latter from one surface to the other first tensions the spring and then causes the part to exert a cam action against the controlling lever to actuate the movable member, and stops to definitely limit

the movement of the controlling lever in both directions.

"3. In a device of the character described, contact members, one of which is movable, an actuating device for said movable contact member comprising a movable member and a spring-controlled pivoted part provided with converging surfaces constituting cams, and a controlling device comprising a pivoted lever arranged to move from one cam surface to the other across the converging ends thereof, said spring normally exerting a force to move said part toward the lever, whereby the movement of the lever from one surface to the other first tensions the spring and then causes the part to exert a cam action against the lever to actuate the movable member. * * *

"8. In a device of the character described, a main frame, a fixed contact carried by said main frame, an actuating device pivotally mounted on said frame, a movable contact operated by said actuating device, said actuating device comprising a spring-pressed part movable relatively thereto and having converging surfaces, a controlling device pivotally mounted on said frame, and a roller carried by said controlling device and adapted to be engaged by different surfaces of said movable part when said controlling device is in different positions, whereby the action of said spring will cause said actuating device to be moved in different directions. * * *

"11. In a device of the character described, contact members, one of which is movable relatively to the other, an actuating device for said movable contact member comprising a spring-actuated part having converging surfaces, a controlling device having a part arranged to be engaged by different surfaces of said spring-actuated part when said controlling device is in different positions, and means on each side of the controlling device to definitely limit the movement of the same in both directions.

"12. In a device of the character described, contact members, one of which is movable relatively to the other, an actuating device for said movable contact member comprising a spring-actuated part having converging surfaces, a controlling device having a part arranged to be engaged by different surfaces of said spring-actuated part when said controlling device is in different positions, and a single pair of stops arranged on opposite sides of said devices to limit both movements of said actuating device and of said controlling device."

It is to be noted that claim 3 is like claim

1, except that the word "pivoted" appears after the word "spring-controlled" and before the word "part," so that it reads "a spring-controlled pivoted part."

Neither claims 1, 3, or 8 have a limitation of the actuating device. Claims 2, 11, and 12, as will be noted, have references to certain stops. Claim 2, after referring to the actuating device and the method of operation of the controlling lever and the part played by the spring, refers to "stops to definitely limit the movement of the controlling lever in both directions." Claim 12 sets forth "a single pair of stops arranged on opposite sides of said devices to limit both movements of said actuating device and of said controlling device." Claim 11 refers to "means on each side of the controlling device to definitely limit the movement of the same in both directions." The stops in claim 2 and the means to limit the movement of the controlling device in claim 11 are only as to the controlling device, while claim 12 is drawn to the stops which coact with both the controlling and the actuating device.

It is apparent that Kimes' object was to make a supposedly simple device in the nature of a quick-acting switch controlled by the rise or fall of pressure in the air tank that would not burn the contacts in breaking the circuit. While many before Kimes had constructed combinations of elements for making and breaking such contacts, it is urged that he produced a new combination of old elements resulting in a new device—novel, compact, simple, and cheaper than the prior devices for the same purpose, with new features which rendered his structure different in plan or principle of construction from the devices which the prior art discloses. New features claimed, as stated by counsel, are as follows:

"(a) A controlling device, *constituted as a single element of the combination*, comprising a pivotally supported lever, such as 22, directly responsive in its actuations to the manipulations of the diaphragm 3, which diaphragm works under the control of air pressure at one side of said diaphragm and spring means at the other side thereof in opposition to said air pressure;

"(b) An actuating device, *manipulated by the controlling device (a) above*, for the movable contact member 16, said actuating device comprising a movable member such as 18, which carries the movable contact member 16, and a spring controlled part such as 29, with which the pivotally supported controlling lever or element cooperates;

"(c) The spring controlled part, such as 29, requires some sort of spring, such as 33, for urging said spring controlled part toward the pivotally supported controlling lever or element, such as 22, in order that there can be co-operation between said controlling lever or element, such as 22, and said spring controlled part, such as 29, so that actuations of the controlling lever or element can be imparted to the movable member, such as 18, and hence to the movable contact member, such as 16; through the spring controlled part, such as 29."

The Kimes patent comprises four units, viz. (a) the diaphragm; (b) the contact members; (c) the actuating device; (d) the controlling device—correlated and acting together to accomplish the purpose of automatically breaking or connecting the electric current and stopping or starting the pumping of air into the chamber beneath the diaphragm. A good description of said patent is given by witness Hammer:

"The Kimes patent shows a construction in which there are three main features. One is what the patent calls a controlling lever, which in the patent drawing is the lever 22, having at its outer free end a roller. Co-operating with this lever is a duplex lever arrangement which the patent calls an actuating device. It is made up of the triangular shaped piece of iron 18 pivoted at the point 19, and swinging back and forth or swinging back and forth across the extreme free end of the controlling lever 22. On this triangular piece 18 is pivotally mounted a link carrying a 'V' shape double cam which is meant to cooperate with the roller on the controlling lever. There is a spring between the pivot 19 and that pivoted link which tends to press the link against the roller on the end of the controlling lever. It happens that the part 18 has mounted upon it has electrical feature 16 which is the movable member of the switch mechanism proper. That is the only electrical part of the device. The rest is purely a mechanism for bringing contact points 17 into contact or separating them from contact. The patent says that the location of that electrical feature is an optional matter. I refer to the bottom of the second column on page 1 where we find the statement 'In the present arrangement the mechanism or movable contact member is secured to and carried by this actuating device. This, however, is an optional arrangement.'"

The alleged offending device is an electric switch structure constructed under Penn patent, heretofore referred to. It is claimed by plaintiff to incorporate all the units of Kimes' device, to be based upon the principle of construction taught by Kimes, to contain all the features of the Kimes combination, and to operate in the same manner and accomplish the same result. By Exhibit No. 9 plaintiff attempted to show that the claims alleged to be infringed can be applied to the drawing of the infringing structure as readily as to the drawing of the Kimes patent, except there might be some dispute upon the question of stops as applicable to claims 2, 11, and 12.

We think it unnecessary to burden this opinion with a careful analysis of the offensive structure or to insert a figure of the same. The purpose of both devices is identical, the result is the same, the method of working out and arriving at the result is somewhat similar, yet there is some difference in the arrangement of parts, particularly as to what is known as the stops, to which reference will hereinafter be made. Were this a pioneer patent, it would evidence considerable inventive genius, and defendant's structure would undoubtedly be an infringement as coming within the fair range of equivalents, but it is not a pioneer. It came into a densely crowded field, so that the question of the range of equivalents properly to be accorded it is of controlling importance.

■ The law applicable in general to infringement is stated in Sanitary Refrigerator Company v. Winters et al., 280 U. S. 30, 41, 42, 50 S. Ct. 9, 12, 74 L. Ed. 147, as follows: "There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' Burr v. Duryee, 1 Wall. 531, 573, 17 L. Ed. 650. Except where form is of the essence of the invention, it has little weight in the decision of such an issue; and, generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' * * * A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement." Hyman v. F. W. Woolworth Co. (C. C. A.) 28 F.(2d) 833; Farrington v. Haywood (C. C. A.) 35 F.(2d) 628; Finch Corp. v. Stelos Co., Inc., 60 App. D. C. 25, 46 F.(2d) 606; Cleveland Automatic Mach. Co. v. National Acme Co. (C. C. A.) 52 F. (2d) 769.

■ Some similarity of function is of course not conclusive on the question of infringement even in case of pioneer patents. Gordon Form Lathe Co. v. Walcott Machine Co. (D. C.) 20 F.(2d) 673; Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

■ In Electric Protection Co. v. American, etc., Co. (C. C. A.) 184 F. 916, 923, this court states the tests of infringement: "To sustain the charge of infringement the infringing device must be substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and co-operate to produce that result. If the devices are substantially different in either of these respects the charge of infringement is not sustained. * * * In determining the question of infringement of a patent for a combination, it is therefore necessary to look at the mode of operation or the way the device works, as well as at the result and the means by which that result is attained. Machine Co. v. Murphy, above."

■ The range of equivalents to which an inventor is entitled is broad in an uncrowded art and narrow in a crowded one. It is commensurate with the scope of the invention, but, as said by the Supreme Court in Sanitary Refrigerator Co. v. Winters, supra, "Where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom." In National Hollow B.-B. Co. v. Interchangeable B.-B. Co., 106 F. 693, 710, in referring to the term "mechanical equivalent," this court said: "* * * The term 'mechanical equivalent,' when applied to the interpretation of a pioneer patent, has a broad and generous sig-

nification, while its meaning is very narrow and limited when it conditions the construction of a patent for a slight and almost immaterial improvement. * * * The doctrine of mechanical equivalents conditions the construction of all these patents, and in determining questions concerning them the breadth of the signification of the term is proportioned in each case to the character of the advance or invention evidenced by the patent under consideration, and is so interpreted by the courts as to protect the inventor against piracy and the public against unauthorized monopoly."

■ When the patent is for an invention of limited scope, the question of what is an equivalent should be very carefully considered. Bryant Electric Co. v. Reno Sales Co., Inc. (D. C.) 16 F.(2d) 789; Wisconsin-Minnesota Gas & Electric Household Appliance Co. v. Hirschy Co. (C. C. A.) 28 F.(2d) 838.

To determine the scope of the claimed invention here and the proper application of the doctrine of equivalents, it is necessary to consider the prior art. Defendant argues that the structure of the claims in issue is found in prior patents as to every element, combination, and function, that there is a complete lack of novelty, and that the claims are invalid. Defendant admits that Kimes may have produced an invention over the prior art in the arrangement of his cam device 30 and roller 31 substantially in line between the pivot 19 of the member 18 and the pivot for the controller lever 22 combined with the stops 26 and 27, but that this arrangement is under claim 4, which is not in issue here. Whatever of novelty there may be is in the special arrangement and alignment of well-known elements. The answer states that the alleged invention of the patent in suit was well known and used by various patentees prior to Kimes patent, and cites the following patents: Plumtree, No. 697,273; Meaher, No. 1,037,251; Pocock, No. 1,128,505; Barnum, No. 1,149,325; Wood, No. 476,050; Marshall, No. 502,981; Blake, No. 520,772; Roesch, No. 657,677; Lungen, No. 659,244; Rusby, No. 758,478; Janette, No. 1,033,920. The first four were cited in the prosecution of the Kimes patent. The others were not. The answer also alleged: "The defendant avers that while the application for said Patent No. 1,195,232, was pending in the United States Patent Office, the applicant so limited and confined the claims under the requirements of the Commissioner of Patents, that the plaintiff can not now seek for or obtain constructions for such claims sufficiently broad to cover any apparatus made, used or sold or threatened to be made, used or sold by this defendant."

■ It appears from the file wrapper that Kimes had considerable trouble in the Patent Office in securing his patent. There were a number of rejections and many amendments and changes of the original claims. His claims when finally granted were so restricted that they appear to be drawn solely to the mechanical part of an electric switch, the sole purpose of which is to make and break an electric current by snap action of the movable contact. The original claims were narrowed to prevent rejection, and the doctrine of equivalents cannot enlarge the scope of a patent restricted by amendments. Smith, Administratrix, v. Magic City Kennel Club, Inc., 282 U. S. 784, 51 S. Ct. 291, 75 L. Ed. 707.

■ These various patents show that in the prior art the field is so occupied with all the elements that are used by Kimes in constructing his combination as to limit the patent to an exceedingly narrow range of equivalents. Pocock shows the elements of Kimes slightly differently arranged in that the spring-controlled part is connected with the control lever instead of the movable member of the actuating device. The only difference apparently in Meaher and Kimes claim 1 is that in Meaher the controlling lever is slidable instead of pivoted and the cam is on the control lever instead of on the spring-controlled part. Both Meaher and Pocock show the cam on the controlling lever. In Kimes the cam is on the movable member. Other patents which were not before the Patent Office, such as Janette, show the cam on the actuating device, while the spring-controlled part is mounted on the control lever. Rusby discloses the parts and functioning of claim 1 for operating the movable contact with a snap action. Blake and Lungen also contain many of the elements of Kimes.

■ We refer to the important feature of stops appearing in Figure 2 Kimes patent as 26 and 27. 32 is also a stop acting in conjunction with them. These stops are not in the infringing structure, although an effort is made to show they are. This is hereinafter discussed. If the stop feature is an essential element in the patent combination covered by the claims, its omission from the Penn device would eliminate the charge of infringement unless there were a substitution of an equivalent. Its absence could not

be regarded as merely a colorable departure. As to the effect of the omission of an essential element upon infringement, the law is well settled. In Chester-Pollard Amusement Co., Inc., v. Popular Games, Inc., et al., 34 F. (2d) 409, 412, this court said, referring to the essential elements of the patent, "It follows that, if a single element or combination of each claim is omitted, then defendants' structure is not an infringement." In Dry Hand Mop Co., Inc., v. Squeez-Ezy Mop Co., Inc. (C. C. A.) 17 F.(2d) 465, dealing with a combination patent, the novelty of which, if any, was in the combination, the court said at page 466 of 17 F.(2d), "The law is conceded by counsel to be that; to constitute infringement of such a patent, the infringer must be shown to have used every ingredient of the combination. An omission of any one element prevents infringement." See, also, Ladd v. W. & H. Walker, Inc., et al. (C. C. A.) 7 F.(2d) 72; Bake-Rite Mfg. Co. v. Tomlinson et al. (C. C. A.) 16 F.(2d) 556; Hyman v. F. W. Woolworth Co. (C. C. A.) 28 F.(2d) 833; Measuregraph Co. v. Grand Rapids Show Case Co. (C. C. A.) 29 F.(2d) 263; Fairbanks, Morse & Co. v. American Valve & Meter Co. et al. (C. C. A.) 31 F.(2d) 103; Magic City Kennel Club, Inc., et al. v. Smith (C. C. A.) 38 F.(2d) 170.

Are these stops an essential part of plaintiff's device? Witness Hammer testified as to this:

" * * * If we refer to claim 12 of the patent in suit which is one of the claims at issue, we find that it calls for a single pair of stops arranged on opposite sides of said device to limit both movements of said actuating device, and of said controlling device. And that can only mean the stops 26 and 27 shown so clearly in Figure 2 of patent drawing gives the single pair of stops 26 and 27, limiting the movement both of the controlling lever 22 and the actuating member 18, to which the electric contacts are connected. And that means referring back to Claim 12 and its requirements, that this single pair of stops shall be on opposite sides of said device which means that lever 22 and the lever 18 of the patent drawing, that we have a single pair of stops on opposite sides of both of these devices, and of course you can't get the relationship unless you have the linear relationship which I have referred to. That comes to the question, not of the levers but of the infringement by the Defendant's switches which do not have a single pair of stops arranged on the two sides of the two devices to limit the movement of both. That single pair is not there.

"And while we are on the subject of stops I refer to Claim 11, which calls for means on each side of the controlling device to definitely limit the movement of the same in both directions. It does not call for any stops on the actuating device at all. The Penn switch has stops on the actuating device, but it calls for stops on the controlling device, and the Penn switch does not have them. Penn has stops for the actuating device, but has no stops for the controlling device. While I am securing that operation in the two directions without touching any stops of any sort or form, does not limit it. It is the operation which is secured by the diaphragm and plunger the one case, which limits it, and there is no operative relationship whatever between any stop and that controlling device. * * *

"I understand counsel, that you are now calling attention to the stops in the plunger of the Kimes patent and that is not the stops which the patent in suit or it claims is referring to. The stops that are under discussion are stops 26 and 27, at the free end of the controlling lever, and they are absolute necessity in the Kimes construction.

"Mr. Braddock: But they are stops for the controlling lever the same as this is? A. No, because the controlling lever in the Kimes patent, the controlling lever will not give the reaction to the spring for the actuating member unless you have the stops 26 and 27, the patent says so, whereas if you didn't have any stops at all in the diaphragm form of the Defendant's construction, the switch element would work just the same, and—

"Mr. Braddock: That is beside the question. The question is whether there are stops for that controller lever? A. I assert from an operative standpoint the plunger stops of the Defendant's diaphragm form has nothing to do with the snap action of the switch, whereas in the Kimes patent they are absolutely essential to the operation of the switch."

The specifications heretofore quoted show how the controlling lever in Kimes is held against the stops and how stop 32 of the controlling device co-operates with stops 26 and 27 in carrying out the functional arrangement.

Exhibit 8, introduced by plaintiff, shows what it is claimed are stops in the alleged infringing device. It shows a small screw extending into the casing which might seem to co-operate with the controlling lever and operate as a stop. This is explained by de-

fendant's witness Mr. Rubel in his testimony as follows:

"I am familiar with the automatic switches manufacturerd by the Penn Electric Switch Company. I know of no switch they manufacture wherein a single pair of stops is used to stop both the actuating device and the control lever. The Penn Company does not employ a screw such as marked No. 27 in Plaintiff's Exhibit 9 which is referred to as stops in claims 2, 11 and 12, as a stop. That is a misinterpretation of the switch, that is not a stop, but an extra screw that is sent along to mount the base on and it is fastened on the outside they have shown it here that way. In reality it does not go through the case when the leg is mounted on. There are no stops necessary in these switches. Plaintiff's Exhibit 8 has a small portion of the screw projecting through the casing, but when the foot or base or leg is actually placed in position so it can be mounted upon the air compressor, the screw goes through a double thickness and does not extend through the casing surface as a stop."

In response to a question of the court as to whether a stop was necessary in the mechanical action, referring to the Penn device, he said:

"A stop is not necessary because when the pressure is exerted on the diaphragm the movement of the diaphragm actuates the lever and cuts off the power. There is no need of a stop as your pressure ceases to be generated as the contacts are formed. The pressure regulating spring is set in here and balances the pressure at a certain predetermined amount. There is no need of a stop after the contacts are open. That cuts off the power. While Plaintiff's Exhibit 8 shows screws extending through, that is not the condition that it is in actually. These screws there, 1 and 2, are the same sort. They do not extend through the casing, because there is a double casing, leg and casing, and the screw never serves as a stop. Plaintiff's Exhibit 9 shows a diaphragm button that is a flat member within the diaphragm chamber that engages one end of the lever 22, and there is not a sufficient amount of movement of the diaphragm button that would ever permit the opposite end of the lever to swing sufficient to engage the casing. The design is such to suspend the movement of the diaphragm and the lever can never get to the casing. That is the way the Penn Electric Switch Company manufacture their pressure switches."

Mr. Hammer testified that Penn had no stops on the controlling device.

We think it established by the record that defendant does not employ stops in its controlling device, and what are claimed to be stops in Exhibit 8 are merely 27, the temporary location of a screw during the shipping of the device, and 26, a resting place for the toe of the lever used by the defendant. The trial court found that, as defendant's switch did not include stops such as defined in claims 2, 11, and 12 of the patent in suit, there was no infringement of said claims. This seems clear.

The situation is slightly different as to claims 1, 3, and 8, which do not contain reference to stops. The trial court, as shown by the decree felt it should find either that these claims embodied combinations long known to the art and that the changes were not sufficient to constitute patentable invention, or that they must be limited by the specifications and drawings to include a device practically as shown in the drawings. It concluded to adopt the latter alternative, holding that the stops would have to be used to make the patent, as shown by the drawings, a practicable working instrument. The expert, Hammer, testified in response to the question concerning claims 1, 3, and 8, and the relation of former disclosures thereto:

"Q. As far as those three are concerned they are so broad in their construction they are covered by former disclosures? A. Yes, if we want to consider that the range of mechanical equivalents was at that time. I have not discussed Claims 1, 3, and 8, as to any great extent. The Court has well. summarized my general conclusions regarding them. I can add this thought, however, they do not include in other words the stop element, and yet stops are absolutely essential to the physical operation of those elements which are recited in those claims. Unless there are stops for the actuator those claims show inoperative combinations and it means that these claims in view of the whereas clause in each of them are purely functional.

"The Court: In other words, if you limit the wording of the claim of the drawings and specifications, it should be considered included in those claims. A. Yes, in the general arrangement substantially as described. In other words, in the specifications and drawings and when you get that element read into those claims substantially as described,

the Penn Company does not infringe because it has not that arrangement of stops."

These stops seem to be a necessary part, according to the evidence, of the operation of the Kimes patent. It would seem that, under the alignment employed when the roller of the control lever 22 passes the point of the cam 30, it is imperative to have a stop for the lever as it must be held where pressure from the cam can be exerted against it so that the spring 33 may push the actuating member 18 to either closing or breaking the circuit, depending of course on which side of the alignment line the lever is stopped. The stops are necessary to prevent the lever carrying the roller so far away from the line that the cam action would fail. The aligned arrangement of parts is not in the Penn structure. Plaintiff claims that claims 1, 3, and 8 are not restricted in terms, and read directly upon the alleged infringing device, and are not restricted by any implication from the drawings which might clear said device.

■ The description in the specifications and drawings of a patent may be referred to as an aid in construing patent claims. In Allis-Chalmers Mfg. Co. et al. v. Columbus Electric & Power Co. (C. C. A.) 19 F.(2d) 860, 864, the court says: "The meaning of those claims is to be determined by considering, not solely the language thereof, but also the patent drawings, and statements and descriptions contained in the specification." See, also, Temco Electric Motor Co. v. Apco Mfg. Co., 275 U. S. 319, 48 S. Ct. 170, 72 L. Ed. 298; N. O. Nelson Mfg. Co. v. F. E. Myers & Bro. Co. (C. C. A.) 25 F.(2d) 659; Economy Baler Co. et al. v. Solar Sturges Mfg. Co. (C. C. A.) 29 F.(2d) 656; Trussell Mfg. Co. v. Wilson-Jones Co. (C. C. A.) 50 F.(2d) 1027; Cleveland Automatic Mach. Co. v. National Acme Co. (C. C. A.) 52 F.(2d) 769.

■ The drawings here are a part of the specifications. As shown by the drawings, the stops are not mere details of construction. The evidence which we have heretofore quoted shows that they are essential to the type of construction revealed. If they are essential, then claims 1, 3, and 8 are obviously broader than the invention justifies. Further, if they are essential, their absence in the defendant's device would negative infringement. We are satisfied the structure complained of cannot be brought within the range of equivalency necessary to constitute infringement.

The decree of the trial court is affirmed.